John Giordano - Cross                    24

1      A.    From viewing him on the mall camera.

2      Q.    And where was my client approximately

3  geographically in that mall when you started to follow

4  him?

5      A.    I'm saying mall camera, inside the store

6  exits into the mall.  He was in the area of the

7  checkouts.

8      Q.    Now, this second time he doesn't have any

9  merchandise allegedly from Value City, does he?

10     A.    Yes, he does.

11     Q.    And what did he have allegedly this time?

12     A.    A black down Perry Ellis jacket.

13     Q.    And did you see him wearing this when he came

14 in?

15     A.    No, he was wearing the same jacket he wore

16 earlier.

17     Q.    Is there a video of that?

18     A.    No, there's not.

19     Q.    And where did that jacket end up?

20     A.    Which one?

21     Q.    The jacket that you say he had the second

22 time when you apprehended him.

23     A.    It was put into evidence at Value City.

Vincent Fiscella - Redirect                59

1      Q.   Have you, after Mr. Facciolo asked the

2   question this morning, attempted to check with Value

3   City to see if they still have the coat that he was

4   caught with at that time?

5      A.   I have, sir.

6      Q.   Have you had any luck?

7      A.   No, sir, I have not.

8      Q.   Okay.  Why not?

9      A.   The loss prevention manager is unavailable at

10  this time.  He has my pager number and will contact me

11  when he comes in.

12     Q.   Okay.

13          Did you feel a need on that day to try and

14  collect any evidence in relation to the second

15  incident?

16     A.   No, sir.

17     Q.   Were you going to charge Mr. Smith with that?

18     A.   No, sir.

19          MR. WALLACE:  Thank you.

20          No further questions, your Honor.

21                ------

22          RECROSS-EXAMINATION

23                ------

John Piser, III - Direct                          40

1    Q.    Okay.  And did Mr. Giordano tell you what

2    happened when he attempted to apprehend this person

3    that he saw take merchandise?

4    A.    Yes, he did, sir.

5    Q.    Did you write a report on that incident?

6    A.    I did.

7    Q.    And what was the purpose of you writing a

8    report?

9    A.    To better help me retain what he told me, the

10   facts of what he told me at the time.

11   Q.    Now, could you tell us, please, what, as best

12   as you can recall -- if you need your report to

13   refresh your recollection -- what specifically did

14   Mr. Giordano tell you happened when he attempted to

15   stop the person who he thought took merchandise?

16   A.    Mr. Giordano told me that he went outside and

17   contacted that person departing the store away from

18   the front entrance doors down towards the stairway

19   that goes down to the lower level of the mall just

20   east of the front doors.

21         He said that he approached the subject and

22   said, "Excuse me" to the subject.  At that time the

23   subject turned around and the coats were under his

John Piser, III - Direct                41

1    left hand -- the merchandise that he did not pay for

2    under his left hand, he motioned with his right hand

3    as if he had a weapon under his coat and told him to

4    back off.  The subject told Mr. Giordano to back off,

5    and at that time Mr. Giordano broke contact and

6    departed the scene.

7       Q.   Did Mr. Giordano explain to you at that

8    point -- how soon after the incident would you have

9    been speaking to Mr. Giordano?  Is it a day after,

10   hours after, minutes after?

11      A.   I would say within 30 to 35 minutes after the

12   incident.

13      Q.   Did he tell you why he backed off from that

14   person who he confronted?

15      A.   Yes, he did.  He believed that the subject

16   was carrying a weapon.

17      Q.   Did he say anything about fearing for his

18   safety or the safety of others?

19      A.   He did say he feared for his safety.  He

20   believed the subject had a gun and it was in his

21   waistband.  He feared for his safety.  That's why he

22   walked away.

23      Q.   And after you took this report of this

John Giordano - Direct          55

1    Q.    What did you do when you were afraid you were

2    going to get shot?  Why didn't you continue to

3    confront the man?

4    A.    I did what he said.  I backed off and went

5    back into the store.

6    Q.    Okay.  What did you think may happen if you

7    did not back off at that point?

8    A.    I wouldn't be able to back off.  I would be

9    shot.

10   Q.    What happened then?

11   A.    I walked back into the store and went to the

12   front customer service area and dialed 911.

13   Q.    Why did you dial 911 at that point?

14   A.    Because Delaware State Police is dispatched

15   through 911.

16   Q.    Okay.

17         And what did you want to report to them?

18   A.    The incident that happened, a shoplifting and

19   a person acted as though he had a weapon.

20   Q.    Now, if this was a normal shoplifting where

21   you really didn't have much information to give the

22   police, no real identification or no tag number or

23   anything like that, would you generally call the

John Giordano - Cross                    20

1              (Pause.)

2    BY MR. FACCIOLO:

3        Q.    When you confronted my client, was he on the

4    steps allegedly, or was he in the parking lot?

5        A.    He was on the steps.

6        Q.    And did you ever indicate that he was in the

7    parking lot?

8        A.    Not the first incident.

9        Q.    When you saw my client allegedly later on

10   when he was apprehended, where was he at that point?

11       A.    At which point?

12       Q.    The second time that you saw my client and

13   apprehended him.

14       A.    He was outside the front entrance of the mall

15   in the parking lot.

16       Q.    So when you have referred previously to a

17   parking lot, you're talking about the second time that

18   you saw him allegedly that day?

19       A.    Yes.

20       Q.    Now, just so everyone can get a feeling for

21   the geography of the mall, the entrance to the mall

22   that you're speaking of is probably on the same

23   sidewalk leading down towards the steps but at the

John Giordano - Cross                    22

1    Q.    And you saw him with regard to the second

2    alleged incident?

3    A.    Yes.

4    Q.    You testified that you saw the defendant

5    later in the day when you were watching the bank of

6    monitors, is that correct?

7    A.    Yes.

8    Q.    Approximately what time was it that you saw,

9    in the camera the defendant allegedly the second time?

10   A.    Around 6:00 o'clock.

11   Q.    And at that time did you suspect him of being

12   the person from this morning?

13   A.    Yes.

14   Q.    And when you apprehended him, how many people

15   were with you when you apprehended him?

16   A.    Myself and one other person.

17   Q.    Who was the other person, please?

18   A.    Another detective for Value City.

19   Q.    And who was that, please?

20   A.    Detective Rogers.

21   Q.    How did you apprehend my client at that time,

22   the second incident?

23   A.    We approached him from behind, went behind

Vincent Fiscella - Redirect          58

1   exit the store to get to it.  So it's the outside

2   area.  I would consider it with the sidewalk and all

3   part of the parking lot.  It has nothing to do with

4   the building.

5       Q.   Okay.

6       A.   He exited the store.

7       Q.   When you wrote in your affidavit, that's what

8   you're talking about, the outside area that by your

9   own definition you consider as parking lot?

10      A.   Yes.

11      Q.   You weren't being specific as to whether it's

12  the stairs part, the sidewalk part, or whatever?

13      A.   No.  At that time I did not have the

14  supplemental report from Corporal Piser, just my

15  synopsis that I got from Corporal Piser verbally, and

16  then in my interview of the victim.

17      Q.   The second incident in which the defendant

18  Smith was actually apprehended, you did not arrest him

19  for any criminal charges in relation to that?

20      A.   I did not.

21      Q.   You did not feel the need to collect any

22  evidence in regard to that?

23      A.   No, sir.

John Giordano - Redirect                           31


1                    (VIDEOTAPE DEMONSTRATION)

2                         - - - - - -

3    BY MR. WALLACE:

4        Q.   We have what's been marked as State's Exhibit

5    Number 1, the surveillance tape.

6             Do me a favor.  Come out here so folks at the

7    defense table can see.

8             I'll stand here for a minute.

9             Is this the defendant walking through the

10   front register, through the front doors?

11       A.   Yes.

12       Q.   So he walks out at 1411?

13       A.   Around 54.

14       Q.   As soon as he did that, you left the security

15   room?

16       A.   Yes.

17       Q.   So you -- right now you're trying to make

18   your way through the store?

19       A.   Yes.

20       Q.   Did you ever watch the tape to see if you can

21   see yourself go through the store?

22       A.   Last time I watched it.  There I am.

23       Q.   It took you about 40 seconds to get across

John Giordano - Redirect                    32

1    there?

2        A.    Yes.

3        Q.    Okay.  And then is this door you went out to

4    the left?

5        A.    Yes.

6        Q.    Did you ever watch to see if you -- are these

7    the doors you came back in?

8        A.    Yes.  I should come back in the doors and go

9    to the left.

10        Q.    So you come in and head that way

11    (indicating)?

12        A.    No.  Head the other way towards the front.

13        Q.    Okay.  Left of the screen?

14        A.    Yes.

15        Q.    Do you know where he went when you came back

16    in to make the phone call?  Would he have been able to

17    see you?

18        A.    No.  I came in.  I tried to get an outside

19    line on these registers.

20        Q.    Is it possible that you're back there now?

21    We don't see you.

22        A.    Yes.

23        Q.    Have you ever checked to see whether you



John Giordano - Redirect                    33

1    could see you coming back?

2        A.    No, I didn't... After I make an apprehension I

3    usually pull the tape and set it aside so it doesn't

4    get retaped.

5        Q.    Is it possible you're obscured by this podium

6    here (indicating)?

7        A.    Right.

8        Q.    When you came back in, you went directly to

9    that area that would have been right behind the

10   podium?

11       A.    Yes.

12       Q.    And made that 911 call; correct?

13       A.    Yes.

14                     - - - - - -

15              (VIDEOTAPE DEMONSTRATION CONCLUDED)

16                     - - - - - -

17   BY MR. WALLACE:

18       Q.    Mr. Facciolo asked you why didn't you tell

19   the dispatcher that what was going through your mind

20   was a fear for other people and stores below.  Did

21   they ask you?

22       A.    No.

23       Q.    Did they ask you, "Why are you calling us?  I

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE        :

                            :

    V.                    :   INDICTMENT BY THE GRAND JURY

                            :   I.D. 9712014022

KENNETH SMITH        :   #N_____

The Grand Jury charges KENNETH SMITH with the following offense, a Felony:

ROBBERY FIRST DEGREE in violation of Title 11, Section 832 of the Delaware

Code of 1974, as amended.

KENNETH SMITH, on or about the 22nd day of December, 1997, in the County of

New Castle, State of Delaware, when in the course of committing theft, did threaten the

immediate use of force upon John Giordano with intent to prevent or overcome resistance to

the taking of property or to the retention thereof and when in the immediate flight therefrom

he displayed what appeared to be a deadly weapon to wit: a gun.

A TRUE BILL

_____         _____
ATTORNEY GENERAL                       (FOREPERSON)

_____
DEPUTY ATTORNEY GENERAL

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    1
                      ( as of  03/03/2004 )
```

State of Delaware v.  KENNETH M SMITH                      DOB: 04/23/1965
State's Atty: PAUL R WALLACE , Esq.        AKA: KENNETH SMITH
Defense Atty: DAVID J. J FACCIOLO , Esq.        KENNETH SMITH

*SDI 193906*

Assigned Judge:

Charges:

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|--------------|-------------|--------|-------------|
| 001 | 9712014022 | IN98011102R1 | ROBBERY 1ST | TG | 06/03/1998 |
| 002 | 9712014022 | N98010594 | ROBBERY 2ND | NOLP | 08/19/1998 |

| No. | Event Date | Event | Judge |
|-----|------------|-------|-------|
| 3 | 01/02/1998 | CASE ACCEPTED IN SUPERIOR COURT. ARREST DATE: 12/22/97 PRELIMINARY HEARING DATE: 12/31/97 BAIL: HELD ON SECURED BAIL                3000.00 100 CONDITIONS OF RELEASE:  NO CONTACT WITH VALUE CITY; NO CONTACT WITH VICTIM. | |
| 1 | 01/20/1998 | NOTICE OF SERVICE - DISCOVERY RESPONSE. | |
| 7 | 01/20/1998 | INDICTMENT, TRUE BILL FILED. #61 ARRAIGNMENT BAIL STATUS 02101998 9:30. CASE REVIEW 03021998 1:45. | |
| 2 | 01/22/1998 | NOTICE OF SERVICE OF DISCOVERY AND ACKNOWLEDGEMENT OF RECEIPT OF | |
| 4 | 02/10/1998 | BAIL MODIFIED.  BAIL NOW SET AT HELD ON SECURED BAIL    15000.00 100 (4022) NO CONTACT WITH VALUE CITY; NO CONTACT WITH VICTIM. | REYNOLDS MICHAEL P. |
| 5 | 02/10/1998 | ARRAIGNMENT CALENDAR, ARRAIGNED. | REYNOLDS MICHAEL P. |
| 6 | 03/18/1998 | ORDER SCHEDULING TRIAL FILED. TRIAL DATE:06021998 CASE CATEGORY:2 ASSIGNED JUDGE (CATEGORY 1 CASES ONLY): UNLESS THE COURT IS ADVISED WITHIN 2 WEEKS OF THE UNAVAILABILITY OF NECESSARY WITNESSES, THE COURT WILL CONSIDER THE MATTER READY FOR TRIAL.  ABSENT EXCEPTIONAL CIRCUMSTANCES, RESCHEDULING OR CONTINUANCE REQUESTS WILL BE DENIED. | GEBELEIN RICHARD S. |
| 8 | 03/31/1998 | | TOLIVER CHARLES H. IV |

CERTIFIED AS A TRUE COPY
ATTEST SHARON AGNEW
PROTHONOTARY

```
                    SUPERIOR COURT CRIMINAL DOCKET                Page    2
                       ( as of  03/03/2004 )

State of Delaware v.  KENNETH M SMITH                   DOB: 04/23/1965
State's Atty: PAUL R WALLACE , Esq.          AKA: KENNETH SMITH
Defense Atty: DAVID J. J FACCIOLO , Esq.          KENNETH SMITH

        Event
No.   Date          Event                           Judge
------------------------------------------------------------------------------
      E-MAIL FILED. TO: PAUL WALLACE, DAG, FROM: B. DIFRANCESCO,
      RE: J. TOLIVER DENIED REQUEST OF CONTINUANCE.
      04/17/1998                            GEBELEIN RICHARD S.
      FAST TRACK CALENDAR, CONTINUED NO NEW DATE GIVEN.
      (DEFT.ATTY OBLIGATION
9     05/04/1998                            GEBELEIN RICHARD S.
      FAST TRACK - CONTESTED VOP:  NEW TRACK ASSIGNED.
      NEW TRACK: TRIAL
      DATE: 060298
      05/19/1998
      DEFENDANT'S LETTER FILED.  (DATED 5/14/98).
10    05/22/1998
      STATE'S WITNESS SUBPOENA ISSUED.
      06/02/1998
      TRIAL CALENDAR-JURY TRIAL WENT TO TRIAL
11    06/02/1998
      LETTER FROM DEF.KENNETH SMITH  TO DAVID FACCIOLO
      RE: REQUEST FOR INFORMATION.
14    06/02/1998
      NOTICE OF SERVICE - DISCOVERY REQUEST.
      DAVID J. J. FACCIOLO
12    06/03/1998                            BARRON NORMAN A.
      JURY TRIAL HELD. 6/3 STATE ORAL MTN IN LIMINE.DENIED.6/3 ORAL MTN FOR
      JUDGEMENT OF ACQUITTAL. DENIED. JURY FOUND DEF. GUILTY OF ROBBERY 1ST
      DEGREE IN-98-01-1102. JURY SWORN. STATE ATTY.P.WALLACE-DEF.ATTY-
      D.FACCIOLO.C/R P.OHARE .C/C A.HAIRSTON
13    06/03/1998                            BARRON NORMAN A.
      CHARGE TO THE JURY FILED.
15    06/05/1998
      MOTION TO DECLARE DEFENDANT AN HABITUAL OFFENDER FILED.
      PAUL R. WALLACE, ESQ.
16    06/17/1998
      LETTER FROM  (SUPREME COURT) TO DEFT.
      A NOTICE OF APPEAL MAY BE FILED WITH THE
      CLERK OF THE SUPRME COURT NO LATER THAN 30 DAYS
      AFTER A SENTENCE IS IMPOSED. AS OF THIS DATE, YOUR
      SENTENCING HAS NOT BEEN SCHEDULLED. YOUR LETTER WILL
      BE PLACED IN THE COURT'S MISCELLANOUS CORRESPONDENE
      FILE. THE SUPREME COURT WILL TAKE NO FURTHER ACTION
      WITH RESPECT TO YOUR JUNE 7 LETTER.
17    06/29/1998
      LETTER FROM: KENNETH SMITH   TO: DAVID FACCIOLO
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    3
                       ( as of   03/03/2004 )

State of Delaware v.  KENNETH M SMITH                      DOB: 04/23/1965
State's Atty: PAUL R WALLACE , Esq.        AKA: KENNETH SMITH
Defense Atty: DAVID J. J FACCIOLO , Esq.        KENNETH SMITH

        Event
No.   Date          Event                              Judge
-----------------------------------------------------------------------------
        RE: REQUEST TO DRAFT A JUDGEMENT NOTWITHSTANDING THE VERDICT MOTION
18   08/05/1998
        MOTION TO DECLARE DEFENDANT AN HABITUAL OFFENDER FILED.
        (AMENDED MOTION) PAUL R. WALLACE, ESQ.
19   08/07/1998                                 BARRON NORMAN A.
        ORDER: IT IS THEREFORE ORDERED THAT KENNETH M. SMITH
        IS DECLARED TO BE AN HABITUAL CRIMINAL OFFENDER UNDER
        THE LAWS OF THE STATE OF DELAWARE; IT IS FURTHER ORDERED
        ATHAT KENNETH M. SMITH SHALL BE SENTENCED PURSUANT TO
        11 DEL C. SEC 4213(B) FOR THE OFFENSE OF ROBBETY FIRST
        DEGREE (IN98-01-1102). SO ORDERED.
     08/07/1998                                 BARRON NORMAN A.
        SENTENCING CALENDAR: DEFENDANT SENTENCED.
21   08/07/1998                                 BARRON NORMAN A.
        SENTENCE: ORDER SIGNED. FILED 8/28/98.
20   08/19/1998
        NOLLE PROSEQUI FILED BY ATTORNEY GENERAL.
        0594, RSN: INDICTED ON OTHER CHRGS.
22   08/25/1998
        DEFENDANT'S LETTER FILED, TO DAVID FACCIOLO, RE: NOTICE OF APPEAL.
23   09/08/1998
        LETTER FROM (SUPREME COURT) TO DAVID J.J. FCCIOLO, ESQ.
        PLEASE FILE A COPY OF JUDGE BARRON'A AUGUST 7, 1998
        SENTENCING ORDER TO BE ATTACHED TO THE NOTICE OF APPEAL
        ON OR BEFORE 091498.
24   09/08/1998
        NOTICE OF APPEAL #392, 1998
25   09/08/1998
        DIRECTIONS TO COURT REPORTER FOR TRANSCRIPT.
        #392, 1998
26   09/08/1998
        LETTER FROM (SUPREME COURT) TO COURT REPORTER
        PURSUANT TO SUPREME COURT RULE 9(B)(IV), THE
        TRANSCRIIPT MUST BE FILED WITH THE PROTHONOTARY
        NO LATER THAN 101398.
32   09/09/1998
        DEFENDANT'S LETTER FILED.
        TO:  DAVID FACCIOLO
        RE:  DEFENDANT WOULD LIKE COPIES OF TRIAL TRANSCRIPTS, PRELIMINARY
        HEARING TRANSCRIPTS, OPENING BRIEF AND APPENDIX.
27   09/28/1998                                 BARRON NORMAN A.
        TRANSCRIPT OF SENTENCING FILED.
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    4
                      ( as of  03/03/2004 )

State of Delaware v.  KENNETH M SMITH                    DOB: 04/23/1965
State's Atty: PAUL R WALLACE , Esq.       AKA: KENNETH SMITH
Defense Atty: DAVID J. J FACCIOLO , Esq.       KENNETH SMITH

       Event
No.   Date           Event                          Judge
---------------------------------------------------------------------------
       AUGUST 7, 1998
28    10/16/1998
       LETTER FROM (SUPREME COURT) TO COURT REPORTER
       PLEASE BE ADVISED THAT YOUR REQUEST IS GRANTED.
       THE TRANSCRIPT MUST BE FILED NO LATER THAN 111298.
29    11/12/1998                               BARRON NORMAN A.
       TRANSCRIPT OF TRIAL FILED.
       JUNE 2, 1998
30    11/12/1998                               BARRON NORMAN A.
       TRANSCRIPT OF TRIAL FILED.
       JUNE 3, 1998
31    11/16/1998
       RECORDS SENT TO SUPREME COURT.
33    11/20/1998
       LETTER FROM (SUPREME COURT) TO PROTHONOTARY
       PURSUANT TO SUPREME COURT RULE 9(B)(I), THE
       RECORD AND TRANSCRIPT MUST BE FILED WITH THIS
       OFFICE NO LATER THAN 112398.
34    11/23/1998
       RECEIPT OF RECORDS ACKNOWLEDGED BY
       SUPREME COURT
35    09/27/1999
       MANDATE FILED FROM SUPREME COURT - AFFIRMED.
       SINCE INDICTMENTS SPECIFY THE CLASSIFICATION
       OF EACH CHARGED OFFENSE, IT FOLLOWS THAT THE
       SAME INFORMATION MAY BE PROVIDED IN THE JURY
       INSTRUCTIONS. ACCORDINGLY, WE FIND NO ERROR.
36    10/01/1999
       MOTION FOR TRANSCRIPT FILED.
       PRO SE REFERRED TO JUDGE BARRON
       REFERRED ON 10/1/99
37    10/05/1999                               BARRON NORMAN A.
       LETTER/ORDER FROM BARRON, J. DATED 10/4/99
       I AM IN RECEIPT OF YOUR PRO SE MOTION FOR TRANSCRIPTS FILED ON 10/1/99
       FOR THE PURPOSE OF FILING A RULE 61 MOTION. YOUR MOTION IN THE
       INSTANT CASE BEING IDENTICALLY GENERAL AND UNSUPPPORTED BY ANY
       SPECIFIC CLAIM OR FACTS, THIS COURT FINDS NO REASON TO REACH A
       CONTRARY CONCLUSION, YOUR MOTION IS DENIED. IT IS SO ORDERED.
38    06/13/2000
       MOTION FOR APPOINTMENT OF COUNSEL (PRO SE)  FILED.
       REFERRED TO JUDGE TOLIVER (OFFICE JUDGE) 6/19/00
40    06/14/2000                               BARRON NORMAN A.
```

```
                    SUPERIOR COURT CRIMINAL DOCKET               Page    5
                         ( as of   03/03/2004 )

State of Delaware v.  KENNETH M SMITH                    DOB: 04/23/1965
State's Atty: PAUL R WALLACE , Esq.      AKA: KENNETH SMITH
Defense Atty: DAVID J. J FACCIOLO , Esq.      KENNETH SMITH

        Event
No.   Date          Event                               Judge
---------------------------------------------------------------------------
        MOTION FOR POSTCONVICTION RELIEF FILED. (PRO SE)
        REFERRED TO JUDGE BARRON 6/21/00
41    06/14/2000
        LETTER FROM ANGELA HAIRSTON   TO PAUL WALLACE, DAG
        RE: NOTIFICATION OF FILING OF PRO SE MOTION FOR POSTCONVICTION RELIEF.
        ATTACHED COPY OF MOTION.
39    06/21/2000                                TOLIVER CHARLES H. IV
        LETTER/ORDER ISSUED BY JUDGE TOLIVER.
        RE: I HAVE NOW HAD THE OPPORTUNITY TO REVIEW YOUR "MOTION FOR
        APPOINTMENT OF COUNSEL" DATED APRIL 25, 2000, WHICH WAS RECEIVED BY TH
        E PROTHONOTARY ON JUNE 13, 2000.  UNFORUNATELY, I AM UNABLE TO GRANT
        THE RELIEF YOU SEEK.  TO MAKE A SHORT STORY EVEN SHORTER, YOU HAVE
        FAILED TO PRESENT TO THE COURT ANY COMPELLING REASON WHICH WOULD
        JUSTIFY THE APPOINTMENT OF COUNSEL.  YOU DO NOT SUGGEST THAT THEY ARE
        PENDING PROCEEDINGS OR THAT YOU HAVE CAUSE OF ACTION RELATED TO YOUR
        CONVICTION THAT YOU ARE ABOUT TO INITIATE AND/OR PURSUE.  FURTHER,
        ASSUMING SUCH A CAUSE OF ACTION OR PROCEEDINGS ARE PENDING, YOU HAVE
        FAILED TO STATE HOW APPOINTMENT OF COUNSEL WOULD BE NECESSARY TO THE
        PROSECUTION OF WHATEVER PROCEEDING OR CAUSE OF ACTION IS AT ISSUE.
        FOR THESE REASONS, THE COURT FINDS NO REASON TO EXERCISE ITS DISCRETIO
        N UNDER SUPERIOR COURT CRIMINAL RULE 61, ASSUMING THAT IT IS
        POSTCONVICTION RELIEF WITH WHICH YOU ARE ULTIMATELY CONCERNED.  STATED
        DIFFERENTLY, YOUR MOTION IS HEREBY DENIED.
42    07/14/2000                                BARRON NORMAN A.
        UPON DEFT'S MOTION FOR POSTCONVICTION RELIEF SUBMITTED: 06/14/00
        DECIDED: 07142000 BEFORE JUDGE BARRON. YOUR MOTION IS SUMMARILY
        DISMISSED. IT IS SO ORDERED.
43    08/07/2000
        NOTICE OF APPEAL FILED.  (COPY) #381, 2000.
44    08/09/2000
        LETTER FROM SUPREME COURT TO PROTHONOTARY.
        RECORD IS DUE NO LATER THAN AUGUST 30, 2000.  #381, 2000.
45    08/14/2000
        RECORDS SENT TO SUPREME COURT.
46    08/14/2000
        RECEIPT OF RECORD ACKNOWLEDGED BY SUPREME COURT.
47    01/19/2001
        RECEIPT OF RECORD AND MANDATE RETURNED FROM SUPREME COURT.
48    01/19/2001
        MANDATE FILED FROM SUPREME COURT:  SUPERIOR COURT JUDGMENT AFFIRMED.
        SUPREME COURT CASE NO:  381, 2000.

            *** END OF DOCKET LISTING AS OF  03/03/2004 ***
                    PRINTED BY: CSCDMOR
```

738 A.2d 239 (Table)
**Unpublished Disposition**

**(Cite as: 738 A.2d 239, 1999 WL 734717 (Del.Supr.))**

(The decision of the Court is referenced in the Atlantic Reporter in a 'Table of Decisions Without Published Opinions.')

Supreme Court of Delaware.

**Kenneth M. SMITH, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Nos. 392, 1998.

Submitted July 20, 1999.
Decided Sept. 7, 1999.

Court Below: Superior Court of the State of Delaware in and for New Castle County, Cr.A. No. IN98-01-1102.

Before VEASEY, Chief Justice, WALSH and BERGER, Justices.

ORDER

**\*\*1** This 7 day of September, 1999, upon consideration of the briefs of the parties, it appears to the Court that:

1) Kenneth M. Smith appeals from his conviction, following a jury trial, of first degree robbery. Smith argues that the jury instructions were improper and that the Superior Court's failure to conduct a formal prayer conference denied him due process.

2) Smith was arrested after shoplifting from Value City, a discount department store. On the afternoon of December 22, 1997, John Giordano, a store security guard, saw Smith take two jackets off the rack, roll them up, and tuck them under his arm. Since Smith's conduct was suspicious, Giordano went to the security office to focus the security camera on him. Giordano saw Smith leave the store without paying for the jackets. Giordano followed him outside and started to confront Smith by saying, "Excuse me." Smith turned around, motioned as if he had a gun in his coat pocket, and said, "Back off." Giordano thought Smith had a gun, so he returned to the store and called the police.

3) Several hours later Giordano again saw Smith shoplifting in the Value City store. This time, Giordano took another store detective with him to apprehend Smith. The two walked up behind Smith, grabbed his arms and handcuffed him. Corporal Piser, the officer who had responded earlier in the day, returned to the Value City after Smith was apprehended. Piser took Smith to the police station without incident.

4) The trial lasted less than two days. At the end of the first day, the Court asked about jury instructions. Specifically, the Court asked Smith whether he would request an instruction on the lesser included offense of robbery second degree. Smith said that he would, and that he might ask for an instruction on shoplifting. The State submitted proposed instructions on first and second degree robbery and the Court indicated that it wanted Smith's proposed shoplifting instruction by the next morning.

5) Both parties submitted proposed shoplifting instructions to the Court before the trial began on the second day. After all of the evidence was presented, the Court asked the parties whether they wanted to talk about the instructions. Smith indicated that he had some concerns, but he never articulated them and the discussion appears to have been cut short by the return of the jury. The parties gave their closing arguments and the Court instructed the jury.

6) After the jury was excused, the Court asked Smith whether he had any exceptions to the charge. Smith noted that there had not been a formal prayer conference, and he lodged what he called objections and exceptions. The Court rejected two of Smith's objections, but did agree to call the jury back and instruct them on state of mind, as Smith requested.

7) Smith argues on appeal that the trial court's failure to conduct a formal prayer conference deprived him of a fair trial. He contends that, because his objections were not heard until after the jury had been instructed, it was too late to issue an effective curative instruction. Smith's argument rests on the mistaken premise that the original jury instructions were improper and required correction. Since, as we find hereafter, the instructions were not

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Ex. A

738 A.2d 239 (Table)
(Cite as: 738 A.2d 239, 1999 WL 734717, **1 (Del.Supr.))

improper, the trial court's failure to conduct a timely prayer conference was harmless error.

**2 8) Concerning the instructions themselves, Smith first argues that the trial court misstated the law when it said, "[u]nder the law, a person displays what appears to be a deadly weapon whenever that person manifests to any of the victim's senses that he is so armed." Smith contends that the word "whenever" created an irrebuttable presumption that prevented the jury from considering whether the victim's belief was credible or whether there was any objective manifestation to support that belief.

9) This argument lacks merit. The jury instruction does not create any presumption and it correctly states the law, which requires that "the victim's subjective belief [be] accompanied by an objective physical manifestation that the robber appears to be displaying a deadly weapon." Deshields v. State, Del.Supr., 706 A.2d 502, 507 (1998).

10) Smith also contends that the trial court erred in instructing the jury that the offense of shoplifting goods worth less than $1,000 is a misdemeanor, Smith argues that, by telling the jury that an offense

is a misdemeanor, the court is indicating the penalties associated with the offense.

11) The jury must decide whether the State has proven that a defendant is guilty. The jury should not "concern itself with what may occur after verdict." Smith v. State, Del.Supr., 317 A.2d 20, 26 (1974). Thus, a court generally should not advise the jury as to possible sentences for the charged offenses. Dutton v. State, Del.Supr., 452 A.2d 127 (1982). Here, the trial court made no mention of possible sentences; it only stated that the shoplifting charge was a misdemeanor. This Court recently held that indictments may be provided to the jury. Woods v. State, Del.Supr., 695 A.2d 1121 (1997). Since indictments specify the classification of each charged offense, it follows that the same information may be provided in the jury instructions. Accordingly, we find no error.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be, and the same hereby is, AFFIRMED.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

1 OF 2 Pages

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KENNETH M. SMITH, | § | |
| | § | |
| Defendant Below- | § | No. 381, 2000 |
| Appellant, | § | |
| | § | |
| v. | § | Court Below—Superior Court |
| | § | of the State of Delaware, |
| STATE OF DELAWARE, | § | in and for New Castle County |
| | § | Cr.A. No. IN98-01-1102 |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted:  October 19, 2000
Decided:  December 20, 2000

Before **VEASEY**, Chief Justice, **BERGER** and **STEELE**, Justices

### O R D E R

This 20th day of December 2000, upon consideration of the

appellant's opening brief and the appellee's motion to affirm pursuant to

Supreme Court Rule 25(a), it appears to the Court that:

(1)    The defendant-appellant, Kenneth M. Smith, appeals from a

July 14, 2000 order of the Superior Court denying his motion for

postconviction relief pursuant to Superior Court Criminal Rule 61.  The

State of Delaware has moved to affirm the judgment of the Superior Court

Ex. B

on the ground that it is manifest on the face of Smith's opening brief that the appeal is without merit.[1] We agree and affirm.

(2)     In this appeal, Smith claims that: 1) his constitutional right of confrontation was violated during his trial; 2) there was insufficient evidence to support his conviction; 3) the jury instructions improperly enhanced the charge against him; 4) there was prosecutorial misconduct; 5) he was improperly sentenced as an habitual offender; 6) defense counsel's closing argument was improper and prejudicial; and 7) he was afforded ineffective assistance of counsel when he was sentenced as an habitual offender.

(3)     On June 3, 1998, Smith was convicted by a Superior Court jury of one count of robbery in the first degree.  Smith was sentenced as an habitual offender to life in prison.[2]  Smith's conviction and sentence were affirmed by this Court on direct appeal.[3]

(4)     When reviewing a motion under Rule 61, this Court must first determine that the motion satisfies the procedural requirements of the rule

---

[1] Supr. Ct. R. 25(a).

[2] 11 Del. C. § 4214(b).

[3] *Smith v. State*, Del. Supr., No. 392, 1998, Berger, J., 1999 WL 734717 (Sept. 7, 1999) (ORDER).

before addressing any substantive issues.[4] Smith's claims of a violation of the right of confrontation, insufficient evidence to support his conviction, prosecutorial misconduct, improper sentencing as an habitual offender and an improper and prejudicial closing argument by defense counsel are all procedurally barred because they were not raised on direct appeal.[5] Moreover, Smith has not shown cause for relief from the procedural default or prejudice from a violation of his rights,[6] and there is no colorable claim of a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.[7]

(5)     Smith's claim that the jury instructions improperly enhanced the charge against him was resolved against him on direct appeal and, thus, is procedurally barred unless reconsideration of the claim is warranted in the interest of justice.[8] We have reviewed in detail the record in this case and conclude that there is no basis for reconsideration of this claim.

---

[4]*Bailey v. State*, Del. Supr., 588 A.2d 1121, 1127 (1991).

[5]Super. Ct. Crim. R. 61(i) (3).

[6]Super. Ct. Crim. R. 61(i) (3) (A), (B).

[7]Super. Ct. Crim. R. 61(i) (5).

[8]Super. Ct. Crim. R. 61(i) (4).

4 OF 5 Pages

(6)    In order to prevail on his final claim of ineffective assistance of counsel, Smith must show that his counsel's representation fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceedings would have been different.[9]  Although not insurmountable, the Strickland standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable."[10]  Our review of the record in this case does not reveal any alleged errors by Smith's counsel that contributed to the Superior Court's decision to sentence him as an habitual offender.

(7)    It is manifest on the face of Smith's opening brief that this appeal is without merit because the issues presented on appeal are controlled by settled Delaware law and, to the extent that judicial discretion is implicated, clearly there was no abuse of discretion.

---

[9]*Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

[10]*Flamer v. State*, Del. Supr., 585 A.2d 736, 753 (1990).

4

5 OF 5 PAGES

NOW, THEREFORE, IT IS ORDERED that, pursuant to Supreme

Court Rule 25(a), the State of Delaware's motion to affirm is GRANTED.

The judgment of the Superior Court is AFFIRMED.

BY THE COURT:

_____
Justice

oc:    Clerk of the Court
c:     Hon. Norman A. Barron
       Kenneth M. Smith
       Loren C. Meyers
       Court's Distribution List

**Westlaw.**

1 OF 11 Pages

Slip Copy
2004 WL 1551513 (Del.Super.)
**(Cite as: 2004 WL 1551513 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware.

STATE of Delaware,
v.
Kenneth M. SMITH, Defendant.

**No. CRIM.A. IN98011102R2.**

Submitted May 12, 2004.
Decided June 28, 2004.

Upon Defendant's Motion for Postconviction Relief.
Denied.

Kenneth M. Smith, Wilmington, Delaware, Defendant,
pro se.

Paul R. Wallace, Deputy Attorney General, New Castle
County, State of Delaware, for the State of Delaware.

ORDER

ABLEMAN, J.

*1 Kenneth M. Smith ("Defendant") has filed this
Motion for Postconviction Relief pursuant to Superior
Court Criminal Procedure Rule 61, wherein he seeks to
set aside a judgment of criminal conviction of Robbery
First Degree. Defendant predicates his claim for relief
on the Delaware Supreme Court's 2003 decision in
*Walton v. State,* [FN1] which redefined the meaning of
the "displays" requirement in Delaware's Robbery First
Degree statute, 11 *Del. C.* § 832(a)(2). Additionally,
Defendant also relies on the *Walton* decision for
overruling the Delaware Supreme Court's holding, in
part, in *McKamey v. State,* [FN2] as to the Court's
interpretation of the word "displays" contained in 11
*Del. C.* § 832(a)(2). Notwithstanding the Court's
opinion in *Walton,* and the resultant overturning of

McKamey's conviction after it had been affirmed on
appeal, the meaning of "displays what appears to be a
deadly weapon" pursuant to 11 *Del. C.* § 832(a)(2) was
subsequently amended by the General Assembly, in an
effort to rehabilitate the inherent import of the statute to
its original intent. Section 832(a)(2), as amended,
provides a more expanded and inclusive interpretation
of the "displays" requirement, to encompass not only a
physical manifestation, but a representation by word or
conduct of a deadly weapon. In light of the
broader-based, implication and meaning now attached
to the amended § 832(a)(2), and for the reasons stated
below, Defendant's motion is DENIED.

FN1. *Walton v. State,* 821 A.2d 871
(Del.2003).

FN2. *McKamey v. State,* 1997 WL 45060
(Del.).

*Statement of Facts*

Defendant was arrested for shoplifting from a Value
City department store on the afternoon of December 22,
1997. On January 20, 1998, Defendant was indicted by
a New Castle County Grand Jury and charged with one
count of Robbery First Degree, in violation of Title 11,
§ 832(a)(2) of the Delaware Code.

On June 3, 1998, following a two-day jury trial, the
Defendant was found guilty of Robbery First Degree.
Pursuant to 11 *Del. C.* § 4214(a) and 4215(b), the State
moved the Court to declare the Defendant to be an
habitual offender and to impose the sentencing
provisions of 11 *Del. C.* § 4214(a) as to the Robbery
First Degree conviction. [FN3] On August 7, 1998, in
connection with Criminal Action No. IN98-01-1102,
Robbery First Degree, the Court sentenced the
Defendant to be incarcerated at Level V for life.

FN3. Defendant was declared an habitual
offender by reason of the following two prior
convictions, in addition to the June 3, 1998
conviction for Robbery First Degree: 1)
Possession with Intent to Deliver Marijuana
(IN88-09-0053), convicted February 15, 1989;

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Ex. C

Slip Copy
2004 WL 1551513 (Del.Super.)
**(Cite as: 2004 WL 1551513 (Del.Super.))**

and 2) Robbery First Degree (IN94-07-0171), convicted March 14, 1995.

Defendant timely filed a direct appeal of his conviction to the Delaware Supreme Court. In his appeal, Defendant raised two issues. First, he contended that the jury instructions were improper, and that the Superior Court failed to conduct a formal prayer conference, denying him due process. On September 7, 1999, the Delaware Supreme Court affirmed Defendant's conviction. [FN4] On June 14, 2000, Defendant filed a *pro se* motion for postconviction relief pursuant to Superior Court Criminal Rule 61. The Court summarily dismissed Defendant's Rule 61 motion on July 14, 2000. [FN5] Defendant appealed this Court's judgment denying Defendant's Rule 61 motion on August 7, 2000. The Delaware Supreme Court affirmed the Court's judgment on December 20, 2000. [FN6] Three years later, Defendant filed a motion for modification of sentence on April 5, 2004. By Order, dated April 16, 2004, the Court denied Defendant's motion because: 1) the motion was filed more than ninety days after imposition of the sentence and was therefore, time-barred; 2) the Court did not find the existence of any extraordinary circumstances; and 3) the postconviction relief that the Defendant was seeking could not be granted by a motion to modify sentence.

FN4. *Smith v. State,* 1999 WL 734717 (Del.).

FN5. In his Rule 61 motion for postconviction relief, Defendant raised seven grounds for relief: 1) violation of the Sixth Amendment right of confrontation; 2) abuse of discretion in denying his motion for acquittal based on insufficient evidence; 3) abuse of discretion in allowing the security videotape to be admitted without redacting portions which were allegedly inaccurate, irrelevant, and inflammatory; 4) prosecutorial misconduct; 5) numerous challenges to life sentence imposed based upon his status as an habitual offender; 6) direct challenges to his sentence and to the imposed, determined, status as a habitual offender; and 7) ineffective assistance of counsel.

FN6. *Smith v. State,* 2000 WL 1887933 (Del.).

*2 On April 30, 2004, Defendant filed, *pro se,* the instant motion for postconviction relief pursuant to Superior Court Criminal Rule 61 based on the recent Delaware Supreme Court decision in *Walton.* In recognition of *Walton's* more restrictive interpretation of the term, "displays what appears to be a deadly weapon," the Delaware Supreme Court overruled, in part, its prior holding in Alvin McKamey's appeal from his conviction, because the evidence of McKamey's actions in the robbery conviction was no longer sufficient under Delaware law to support a conviction for Robbery First Degree. [FN7] As a result of the Supreme Court's findings in *Walton,* this Court, in its November 26, 2003 Order, granted, in part, McKamey's Rule 61 motion for postconviction relief with respect to the reduction of his sentence from Robbery First Degree to Robbery Second Degree. [FN8]

FN7. *Walton,* 821 A.2d at 875 n. 14.

FN8. *See State v. McKamey,* 2003 WL 22852614 (Del.Super.Ct.).

Based on this procedural/substantive history, Defendant filed the instant motion for postconviction relief, relying on the precedent established in *Walton,* thereby asserting the same contention that, in recognition of the *Walton* Court's interpretation of the "displays" requirement of § 832(a)(2), the evidence does not establish that he displayed what appeared to be a deadly weapon, as required for a Robbery First Degree conviction. Defendant submits that the circumstances under which he was convicted of Robbery First Degree, i.e. failure to have openly displayed or physically manifested a weapon, demonstrate that he is similarly situated to Alvin McKamey. Unlike McKamey, Defendant does not request relief in the form of reduction of his sentence from first-degree robbery to second-degree robbery. Rather, Defendant requests that his conviction of Robbery First Degree be vacated, and a judgment of acquittal be entered.

*Applicable Procedural Bars*

Under Delaware law, when considering a motion for postconviction relief, this Court must first determine whether the defendant has met the procedural

Slip Copy
2004 WL 1551513 (Del.Super.)
(Cite as: 2004 WL 1551513 (Del.Super.))

3 OF 11 Pages

requirements of Superior Court Criminal Rule 61(i) before it may consider the merits of defendant's postconviction relief claim. [FN9] To protect the integrity of the procedural rules, the Court should not consider the merits of a postconviction claim where a procedural bar exists. [FN10]

> FN9. *Bailey v. State*, 588 A.2d 1121, 1127 (Del.1991); *Younger v. State*, 580 A.2d 552, 554 (Del.1990) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

> FN10. *State v. Gattis*, 1995 WL 790961, at *3 (Del.Super.Ct.) (citing *Younger*, 580 A.2d at 554).

Pursuant to Rule 61(i)(1), a postconviction motion that is filed more than three years after judgment of conviction is untimely, and thus procedurally barred. The time bar of Super. Ct.Crim. R. 61(i)(1) more fully provides:

A motion for postconviction relief may not be filed more than three years after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than three years after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court. [FN11]

> FN11. Super. Ct.Crim. R. 61(i)(1).

The Rule 61 time bar is not an *absolute* prohibition to post-conviction relief petitions filed three years after conviction. [FN12] Rule 61(i)(5) may potentially overcome the procedural bars of Rule 61. Rule 61(i)(5) "[i]s a general default provision, and permits a petitioner to seek relief if he or she was otherwise procedurally barred under Rules 61(i)(1)-(3)." [FN13] Rule 61(i)(5) provides:

> FN12. *Bailey*, 588 A.2d at 1125 (citing *Boyer v. State*, 562 A . 2d 1186, 1188 (Del.1989)).

> FN13. *Bailey*, 588 A.2d at 1129.

*3 The bars to relief in paragraphs (1), (2), and (3) of this subdivision shall not apply to a claim that the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction. [FN14]

> FN14. Super. Ct.Crim. R. 61(i)(5).

The "miscarriage of justice" or "fundamental fairness" exception contained in Rule 61(i)(5) is "[a] *narrow one* and has been *applied only in limited circumstances*, such as when the right relied upon has been recognized for the first time after a direct appeal." [FN15] This exception may also apply to a claim that there has been a mistaken waiver of fundamental constitutional rights, such as a mistaken waiver of rights to trial, counsel, confrontation, the opportunity to present evidence, protection from self-incrimination and appeal. [FN16] Accordingly, when a petitioner puts forth a colorable claim of mistaken waiver of important constitutional rights, Rule 61(i)(5) is available to him. [FN17]

> FN15. *Younger*, 580 A.2d at 555 (citing *Teague v. Lane*, 489 U . S. 288, 297-99 (1989))(emphasis added).

> FN16. *Webster v. State*, 604 A.2d 1364, 1366 (Del.1992).

> FN17. *Id.* (citing comparatively *Younger v. State*, 580 A.2d 552, 555 (Del.1990)) (fundamental fairness exception of Rule 61(i)(5) applies where petitioner shows he was deprived of a substantial constitutional right).

If a movant presents a genuine "colorable claim," it will be sufficient to avoid dismissal of the claim and will require the Court to examine the evidentiary issues. It is worth noting, however, that once a movant makes a showing that he is entitled to relief, thereby avoiding summary dismissal of his motion, [FN18] an evidentiary hearing is not necessarily required. [FN19] The Court may instead elect to examine the evidentiary issues presented in the submissions of the party and in the record without a hearing. Also, whether the movant

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
2004 WL 1551513 (Del.Super.)
(Cite as: 2004 WL 1551513 (Del.Super.))

has presented a "colorable claim" may be determined on the basis of the postconviction motion itself, prior to any responses being filed.

> FN18. Super. Ct.Crim. R. 61(d)(4) states: Summary dismissal. If it plainly appears from the motion for postconviction relief and the record of prior proceedings in the case that the movant is not entitled to relief, the judge may enter an order for its summary dismissal and cause the movant to be notified.

> FN19. Super. Ct.Crim. R. 61(h) states in part: *Evidentiary hearing,* (1) Determination by court. After considering the motion for postconviction relief, the state's response, the movant's reply, if any, the record of prior proceedings in the case, and any added materials, the judge shall determine whether an evidentiary hearing is desirable ... (3) Summary Disposition. If it appears that an evidentiary hearing is not desirable, the judge shall make such disposition of the motion as justice dictates.

Moreover, "[i]n a postconviction proceeding, *the petitioner has the burden of proof* and must show that he has been deprived of a substantial constitutional right before he is entitled to any relief." [FN20] In other words, "[t]he petitioner bears the burden of establishing a 'colorable claim' of injustice. (citation omitted). While 'colorable claim' does not necessarily require a conclusive showing of trial error, mere 'speculation' that a different result might have [sic] obtained certainly does not satisfy the requirement ." [FN21] Finally, the question of whether a movant has presented a "colorable claim" is a question of law that is reviewed by the Delaware Supreme Court *de novo.* [FN22]

> FN20. *Bailey,* 588 A.2d at 1130 (citing *Younger v. State,* 580 A.2d 552, 555 (Del.1990)) (emphasis added).

> FN21. *State v. Getz,* 1994 WL 465543, at *11 (Del.Super.Ct.).

> FN22. *Webster,* 604 A.2d at 1366.

### Discussion

Upon initial review of Defendant's motion for postconviction relief, the Court finds that Defendant has failed to overcome the first, of two applicable obstacles, with respect to the procedural bars imposed by Rule 61(i), i.e., the time limitation bar to relief set forth in Rule 61(i)(1). Defendant filed the instant motion approximately four and one half years after the judgment of conviction became final on September 7, 1999. [FN23] Notwithstanding the fact that the Defendant does assert a new retroactive right under the auspices of *Walton,* his motion is procedurally time-barred under Rule 61(i)(1). The Court will forego addressing the assertion of a newly created retroactive right within the purview of the constraints imposed by Rule 61(i)(1). Rather, in deference to the Defendant, and in a light most favorable to the Defendant, the Court will address the nature, applicability, and diminution of this right, as it pertains to the Defendant's case, within the constructs of Rule 61(i)(5). As Rule 61(i)(1) and (5) both speak to an exception consisting of a newly recognized right, and since Rule 61(i)(5) acts as a general default provision, excluding discussion of the asserted right in an analysis of the applicability of Rule 61(i)(1) is not injurious to the Defendant's claim. Rule 61(i)(5) affords the Defendant the same, if not a more appropriate opportunity, by inclusion of a discussion and analysis of the right under the broader moniker of "miscarriage of justice" or "fundamental fairness."

> FN23. Within the purview of Rule 61(i)(1), a conviction becomes final for purposes of postconviction review:
> (a) for a defendant who takes a direct appeal of the conviction, when the direct appeal process is complete (the date of the issuance of the mandate under Supreme Court Rule 19); or
> (b) for a defendant who does not take a direct appeal, when the time for direct appeal has expired (30 days after sentencing); or
> (c) if the United States Supreme Court grants certiorari to a defendant from a decision of this Court, when that Court's mandate issues. *Jackson v. State,* 654 A.2d 829, 833 (Del.1995).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
2004 WL 1551513 (Del.Super.)
**(Cite as: 2004 WL 1551513 (Del.Super.))**



**\*4** Thus, since the Defendant is procedurally barred under Rule 61(i)(1), his only alternative means of relief is to proceed under Rule 61(i)(5). Defendant has made no claim that the court lacked jurisdiction. He therefore has the burden of presenting a "colorable claim" that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.

The foundation for Defendant's "colorable claim" for postconviction relief originates from the Delaware Supreme Court's 2003 revisionary interpretation applied to the "displays" of "what appears to be a deadly weapon" text of 11 *Del. C.* § 832(a)(2) as delineated in *Walton.* In essence, Defendant alleges that his ground for relief originates from the "fundamental fairness" or "miscarriage of justice" exception indigenous to Rule 61(i)(5). Pursuant to the tenets of Rule 61(i)(5), Defendant requests that the Court affirm an alleged, relied-upon right, recognized for the first time after a direct appeal, that is, the conviction for Robbery First Degree should be vacated due to insufficiency of evidence under the Delaware Supreme Court's construction of 11 *Del. C.* § 832(a)(2) in *Walton.* Therefore, as a matter of recourse, the Court finds that consideration of Defendant's claim can only be examined under the "colorable claim" exception of Rule 61(i)(5). [FN24]

> FN24. The Delaware Supreme Court has noted that the "interest of justice" exception of Rule 61(i)(4) and the "miscarriage of justice" exception of Rule 61(i)(5) have distinct denotations under the Rule. In *Bailey v. State,* the Delaware Supreme Court emphasized the importance of the difference between these exceptions, holding that, "[w]e underscore that the terms 'interest of justice' and 'miscarriage of justice' have different and distinct meanings under Rule 61. *Bailey v. State,* 588 A.2d 1121, 1127 (Del.1991). The trial court committed error if it treated the two conterminously." *Id.* at 1127 n. 6. Further, "[w]hile Rule 61(i)(4) allows for consideration of certain issues which have been previously litigated 'in the interest of justice,' Rule 61(i)(5) provides for postconviction consideration of issues which have *not* been previously litigated and may entail a 'miscarriage of justice.'" *State v. Rosa,* 1992 WL 302295, at \*7 (Del.Super. Ct .).

Accordingly, each subsection of the statute employs different criteria for both consideration and relief of postconviction claims. *Id.* In light of this distinction, and since Defendant's claim could not have been previously litigated at trial, on appeal, or in his first postconviction motion, because it did not come to fruition until the advent of *Walton,* Defendant's claim is properly considered under Rule 61(i)(5) only.

*Legal Analysis*

Turning to the substantive claim of his motion, Defendant relies on the Delaware Supreme Court's decision in *Walton,* which overturned, in part, the Court's earlier affirmation of Alvin McKamey's direct appeal of his Robbery First Degree conviction. Defendant relies on these decisions as grounds, not for reducing his Robbery First Degree conviction to Robbery Second Degree, but for the Court to vacate his sentence and a judgment of acquittal to be entered.

In *Walton,* the Court reversed twenty-five years of legal precedent by redefining the "displays what appears to be a deadly weapon" requirement encompassed in 11 *Del. C.* § 832(a)(2). [FN25] Prior to *Walton,* Delaware courts had attributed the word "displays" under the statute to denote, not only the notion of spreading before view or exhibiting to the sight, but also to represent that which is manifested to any of a victim's senses. [FN26] A weapon was "displayed" to a victim, for purposes of the statute, if the weapon was exhibited to the victim's mind through any of the victim's senses. [FN27] The "displays" requirement could be predicated only on the victim's belief that a defendant possessed a deadly weapon, and some objective manifestation of a weapon, even if the weapon was unseen. [FN28] In almost every case, the objective manifestation was in the form of a defendant alleging to have a weapon while concealing his or her hand under a piece of clothing. [FN29]

> FN25. § 832 provides, in part:
> (a) A person is guilty of robbery in the first degree when the person commits the crime of robbery in the second degree and when, in the course of the commission of the crime or of immediate flight therefrom, the person or another participant in the crime: ... (2) Displays what appears to be a deadly

Slip Copy
2004 WL 1551513 (Del.Super.)
(Cite as: 2004 WL 1551513 (Del.Super.))

6 OF 11 Pages

weapon[.] DEL. CODE ANN. tit. 11, § 832(a)(2) (2001 & Supp.2002).

FN26. *State v. Smallwood*, 346 A.2d 164, 166 (Del.1975).

FN27. *Smallwood*, 346 A.2d at 165.

FN28. *Id.* at 166 (holding that one who is made to feel by the sense of touch the presence of an apparent gun may never see it but there is recognition, and the manifestation is just as effective, for the purpose of this section, as putting a gun in plain view); *accord Lawrence v. State*, 790 A.2d 476 (Del.2002) (holding that "displays" includes a defendant's act of wrapping cloth around his hand so that it appears to hide a gun, where the victim reasonably apprehended that the defendant was armed); *Deshields v. State*, 544 A.2d 265 (Del.1988) (defendant reached into his coat pocket as if he was reaching for a gun while threatening the victims); *Mercado v. State*, 515 A.2d 398 (Del.1986) (defendant tapped a bulge in his waistline, which victim perceived to be a handgun, and made a verbal threat); *Williams v. State*, 494 A.2d 1237 (Del.1985) (defendant had his hands clasped together pointed at the victim admonishing with a verbal threat); *Harrigan v. State*, 447 A.2d 1191 (Del.1982) (defendant had one hand inside a coat and made a verbal threat to shoot one of the victims).

FN29. In her dissent in *Walton*, Justice Berger took exception to the majority's abandonment of the basic tenets inherent in the Court's then-extant interpretation of "displays what appears to be a deadly weapon," as first defined in *Smallwood* some twenty-five years earlier. In support of her dissenting position, Justice Berger emphasized a litany of case law evidencing the Court's reliance over the years on the settled principles announced in *Smallwood*, i.e., the word "display" means to "exhibit to the sight or mind" and the "display" requirement is satisfied if the weapon is "manifested to any of a victim's senses," even if the manifestation was not

obvious to the observer or consisted of a verbal threat. *Walton*, 821 A.2d at 879-81.

The first winds of change in the Court's reasoning occurred, quite unexpectedly, a year before *Walton* was decided. The Delaware Supreme Court held in *Word v. State* [FN30] that a bank teller's testimony that she thought the defendant had a weapon, because his note stated, "I am armed," did not establish that defendant had displayed what appeared to be a deadly weapon, and was thus unaccompanied by a physical manifestation of a weapon, a required element of first-degree robbery.

FN30. *Word v. State*, 801 A.2d 927 (Del.2002).

*5 The following year, in *Walton*, the defendant entered a bank and handed the bank teller a note that read, "I have a bomb. Give me all your money and no dye pack." The bank teller later testified that she did not see anything that appeared to be a weapon on the robber's person but that he did have his hand in his pocket, which scared her. Yet, there was no evidence that the hand in the pocket "appeared to be a deadly weapon." [FN31]

FN31. *Walton*, 821 A.2d at 873-74.

The *Walton* Court adopted a two-part analysis to examine the "displays" requirement in § 832(a)(2), focusing on its determinative value as one of the elements elevating a crime of Robbery Second Degree to Robbery First Degree. First, the victim must *subjectively* believe the defendant has a weapon. [FN32] Second, the defendant's threat must be accompanied by an *objective* manifestation of a weapon. [FN33] Relying on its decision in *Word*, the Court held that Walton's conduct could not be construed as "displays" because the Court, since *Smallwood*, had always accorded the word "displays" its plain meaning in interpreting § 832(a)(2), i.e., "to spread before view," "exhibit to the sight or mind," "give evidence of." [FN34] Secondly, the Court opined that Walton's hand in the pocket "[c]annot lead to a permissible inference of an 'appearance' of a deadly weapon. The solitary reference to Walton's hand in the pocket is not an objective physical manifestation that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
2004 WL 1551513 (Del.Super.)
(Cite as: 2004 WL 1551513 (Del.Super.))

7 OF 11 Pages

Walton displayed what appeared to be a bomb."
[FN35] Reaffirming its opinion that "displays" is "[t]he
*conduct* establishing the additional, aggravating
element that elevates second degree robbery to the more
serious, first degree offense," the Court concluded by
recognizing that, "[a] verbal threat cannot, itself, be a
'display' of what 'appears to be a deadly weapon.' "
[FN36] If that were the case, the Court rationalized,
then the sensitivity of each particular victim to a verbal
threat would be the determining factor in whether the
offense was elevated from second degree to first degree.
[FN37]

> FN32. *Id.* at 874 (citing *Smallwood,* 346 A.2d
> at 166, for the proposition that this
> requirement is consistent with an essential
> element of the offense).

> FN33. *Id.* at 874 (citing *DeShields,* 706 A.2d
> at 507).

> FN34. *Id.* at 876.

> FN35. *Id.* at 875-76.

> FN36. *Id.* at 877.

> FN37. *Id.*

In upholding Walton's contention that having his hand
in his pocket, without any elaboration, cannot constitute
an objective physical manifestation sufficient to support
the requirement of an "objective physical
manifestation" that he displayed what appeared to be a
deadly weapon, the Court concurrently overruled Alvin
McKamey's First Degree Robbery conviction, to the
extent that it was inconsistent with *Walton* and *Word.*
[FN38] As was to be expected, McKamey filed a Rule
61 motion seeking relief from his conviction of
first-degree robbery. At present, Alvin McKamey
awaits resentencing. [FN39]

> FN38. "In *Word* we referred, among other
> cases, to a summary order of a panel of this
> Court in *McKamey v. State,* 1997 WL 45060

(Del.Supr.). *See Word,* 801 A.2d at 931. In
*McKamey,* we upheld a first degree robbery
conviction upon evidence showing only that
the defendant robbed a cab driver where the
defendant "sat behind the driver in a moving
cab and told the driver that he had a gun." *Id.*
(quoting *McKamey,* 1997 WL 45060 at *2).
We said in *Word* that we did not "read our
summary order in *McKamey* that was entered
before our *DeShields* opinion as reliable
precedent to permit a finding of 'displays what
appears to be a deadly weapon' where the
victim did not perceive any display or physical
manifestation of a weapon." *Id.* We now
conclude that the facts of *McKamey* cannot be
substantially distinguished from the facts in
*Word* or from the facts of the case before us.
Therefore, in this en Banc case, we now
overrule *McKamey* to the extent that it is
inconsistent with the instant holding or the
holding in *Word." Id.* at 875 n. 14.

> FN39. Before this Court could resentence
> McKamey, he appealed that portion of the
> Court's November 26, 2003 Order denying, in
> part, his Rule 61 motion for postconviction
> relief. On May 3, 2004, the Delaware
> Supreme Court affirmed the Court's Order
> granting, in part, McKamey's Rule 61 motion
> for reduction of his sentence from Robbery
> First Degree to Robbery Second Degree and
> denying, in part, that portion of his motion that
> requested relief from habitual offender status.
> In accordance with the Court's decision in
> *Walton,* a resentencing hearing will be held in
> connection with McKamey's Robbery First
> Degree charge of the indictment,
> IN94-07-0222, at which time a new verdict
> will be entered on the record and the
> conviction for this charge will be reduced
> from Robbery First Degree to Robbery
> Second Degree pursuant to 11 *Del. C.* § 831.

Walton was decided on April 25, 2003. In response to
*Word, Walton,* and *McKamey,* and before any
anticipated ramifications resulting from the revised
meaning assigned to the phraseology "displays" of
"what appears to be a deadly weapon" could
materialize, § 832(a)(2) was amended shortly thereafter,
on June 30, 2003. In April 2003, the Delaware General
Assembly had introduced House Bill No. 115,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
2004 WL 1551513 (Del.Super.)
**(Cite as: 2004 WL 1551513 (Del.Super.))**

amending § 832(a)(2) by striking the phrase "deadly weapon" and inserting the phrase "deadly weapon or represents by word or conduct that he or she is in possession or control of a deadly weapon." [FN40] On April 17, 2003, the Bill successfully passed in the House by a unanimous vote of 38-0.

> FN40. H.B. 115, § 1, 142nd Gen. Assem. (Del.2003).

*6 In focusing the Court's attention on an interpretation of the newly amended § 832(a)(2), it is well established that, when construing the language of a statute, Delaware courts attempt to ascertain and give effect to legislative intent, [FN41] i.e., the "objective of statutory construction is to 'ascertain and give effect to the intent of the legislature." ' [FN42] In the construction of a statute, the Delaware Supreme Court has established as its standard the search for legislative intent. [FN43] Further, '[w]here the intent of the legislature is clearly reflected by unambiguous language in the statute, the language itself controls .' [FN44] That is to say, if a statute contains unmistakable language, no interpretation is required and the plain meaning of the words control. [FN45]

> FN41. *Ingram v. Thorpe,* 747 A.2d 545, 547 (Del.2000); *State v.. Cephas,* 637 A.2d 20, 23 (Del.1994).

> FN42. *Dir. of Revenue v. CNA Holdings, Inc., f/k/a Hoechst Celanese Corp.,* 818 A.2d 953, 957 (Del.2003) (quoting *Ingram,* 747 A.2d at 547).

> FN43. *Cephas,* 637 A.2d at 23; *Sandt v. Del. Solid Waste Auth.,* 640 A.2d 1030, 1032 (Del.1994).

> FN44. *Sandt,* 640 A.2d at 1032 (quoting *Spielberg v. State,* 558 A.2d 291, 293 (Del.1989)); *see also Streett v. State,* 669 A .2d 9, 12 (Del.1995); *Cephas,* 637 A.2d at 23.

> FN45. *Ingram,* 747 A.2d at 547; *accord Eliason v. Englehart,* 733 A.2d 944, 946

(Del.1999); *Cephas,* 637 A.2d at 23; *Spielberg,* 558 A.2d at 293.

Interpretation of legislative intent and statutory construction requires that a court first examine the text of the statute in its context to determine if it is ambiguous. [FN46] By and large, a statute is ambiguous if it is "reasonably susceptible of two interpretations" or to evoking different conclusions. [FN47] A statute may also contain ambiguity, "[i]f a literal interpretation of the words of the statute would lead to a result so unreasonable or absurd that it could not have been intended by the legislature." [FN48] Therefore, in those instances where a statute's language lends itself to ambiguity, "[a] court must seek to resolve the ambiguity by ascertaining the legislative intent." [FN49] Concomitantly, in those instances when the language of a statute harbors no ambiguity and application of the literal meaning of its words would not be unreasonable, there is no basis for an interpretation of those words by the court. [FN50]

> FN46. *Snyder v. Andrews,* 708 A.2d 237, 241 (Del.1998); *State v. Reynolds,* 669 A.2d 90, 93 (Del.1995).

> FN47. *CNA Holdings, Inc.,* 818 A.2d at 957; *accord Newtowne Vill. Serv. Corp. v. Newtowne Rd. Dev. Co.,* 772 A.2d 172, 175 (Del.2001); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.,* 492 A.2d 1242, 1246 (Del.1985).

> FN48. *CNA Holdings, Inc.,* 818 A.2d at 957; *accord Newtowne Vill. Serv. Corp.,* 772 A.2d at 175; *Snyder,* 708 A.2d at 241; *DiStefano v. Watson,* 566 A.2d 1, 4 (Del.1989).

> FN49. *Snyder,* 708 A.2d at 241; *Acierno v. Worthy Bros. Pipeline Corp.,* 656 A.2d 1085, 1088 (Del.1995).

> FN50. *Snyder,* 708 A.2d at 241; *DiStefano,* 566 A.2d at 4.

In construing § 832(a)(2), as amended, and in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
2004 WL 1551513 (Del.Super.)
(Cite as: 2004 WL 1551513 (Del.Super.))

interpreting the General Assembly's intent, it is evident that, by amplifying and expanding, with unambiguous language, the conditions under which an individual may manifest a deadly weapon, the legislative effect was to shore up the gap created by *Walton.* "When a legislative body ... amends its prior enactment by a material change of language, the rule of statutory construction presumes that a change in meaning was intended." [FN51] Further, courts have considered assorted external factors in seeking out legislative intent. [FN52] As such, "[t]he synopsis of a bill is a proper source from which to glean legislative intent." [FN53]

> FN51. *Daniel D. Rappa, Inc. v. Engelhardt,* 256 A.2d 744, 746 (Del.1969) (citing 1 Sutherland, Statutory Construction (3rd. Ed.), § 1930).

> FN52. *Siegman v. Columbia Pictures Entertainment, Inc.,* 576 A.2d 625, 634 (Del. Ch.1989).

> FN53. *Carper v. New Castle County Bd. of Ed.,* 432 A.2d 1202, 1205 (Del.1981).

The synopsis accompanying the bill reveals an insightful explanation into the General Assembly's ultimate objective. The General Assembly put in plain words that:

> In 1975, the Delaware Supreme Court interpreted Delaware's Robbery First Degree statute as applying whenever a criminal intimidates a victim by manifesting the presence of a deadly weapon in such a way that it is perceived by any of the victim's senses. *State v. Smallwood,* 346 A.2d 164 (Del.1975). In 1997, the Court followed the *Smallwood* case when it upheld the conviction of a robber in a case where the only manifestation to the victim of the presence of a deadly weapon was the defendant's verbal threat that he had a gun. *McKamey v. State,* 1997 WL 45060 (Del.). In 2002, the Court adopted a contrary interpretation of the robbery statute and reversed a bank robbery conviction in a case where the defendant demanded money from a bank teller after handing her a note that read[,] "[t]his is a holdup ... I am armed," reasoning that such evidence was insufficient to meet the statutory requirement that the presence of a deadly weapon was made manifest to the victim.

*7 This Amendment clarifies that any person who represents by word or conduct that they are in possession or control of a deadly weapon is committing a more serious crime than if there were no such representations.

> This Act will clarify that it is the General Assembly's intent to ensure that the Robbery First Degree statute will apply whenever a criminal intends to intimidate a robbery victim by threatening the presence of a deadly weapon, regardless of whether the intimidation is accomplished by a physical display of what appears to be a deadly weapon[,] or a verbal threat[,] or other conduct that clearly implies that the criminal is so armed. [FN54]

> FN54. H.B. 115, 142nd Gen. Assem. (Del.2003), Synopsis.

Defendant was appropriately convicted of Robbery First Degree in 1998 under the then-extant version of § 832(a)(2), as first defined in *Smallwood.* Under the *Smallwood* standard, Defendant was found guilty of intimidating his victim, Security Guard John Giordano, by manifesting the presence of a deadly weapon in such a way that his victim perceived, through his senses, the existence of a deadly weapon, even if Defendant did not actually possess a weapon. At trial, Mr. Giordano testified that he first saw the Defendant with his hand under his coat. When asked if he could discern what was under the Defendant's coat, Mr. Giordano answered that he could not see if anything was there. The relevant testimony substantiates and evidences, as such:

> Q. When you said, "Excuse me," what did the defendant then do?
> A. He turned around with his right arm--hand inside of his jacket as if he was going to get something (indicating).
> Q. You're indicating--your right hand is tucked kind of--I guess the front opening?
> A. Right....
> Q. Okay. Put your hand back. Do exactly what he did to you at that point.
> A. He turned around--he turned around like this and said, "Back Off."
> Q. Did he still have the coats in his left hand?
> A. Yes. The coats were up under here (indicating), hand was in here, he said, "Back Off."
> Q. Could you see what was under the coat?
> A. No, I couldn't.
> Q. Now, you just explained it. Did he use that same tone? Was he a matter of fact? Was he menacing?

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:05-cv-00262-SLR    Document 2-2    Filed 05/03/2005    Page 34 of 40

Slip Copy
2004 WL 1551513 (Del.Super.)
(Cite as: 2004 WL 1551513 (Del.Super.))

10 OF 11 Pages

How did he say it to you?
A. He said it like he meant it. Like there actually was something underneath his coat.
Q. Okay. How did you feel at that point? What did you think?
A. Well, doing this for 18 years, I've come to know when something is wrong and when to walk away.
Q. Why did you walk away?
A. Because I was afraid I was going to get shot. [FN55]

FN55. Tr. of Trial Proceedings, dated June 2, 1998, at 53-54.

Hence, Defendant was properly sentenced based on years of accepted, well-settled, principal requirements, initially established in *Smallwood*, wherein "displays" meant to "exhibit to the sight or mind" and the "displays" requirement was satisfied if the weapon was "manifested to any of a victim's senses," even if the manifestation was not obvious to the observer or consisted of a verbal threat.

*8 Moving forward to Defendant's present contention that *Walton* has eroded these principles to require a substantiation of a physical or overt manifestation of a deadly weapon, the Court finds that Defendant's claim must fail for several reasons. Foremost in this conclusion, the Defendant's Rule 61 motion was filed almost one year after § 832(a)(2) was amended. Therefore, Defendant's motion for relief does not fall within that narrow ambit of time commencing with the holding in *Walton*, and terminating with the amendment of § 832(a)(2). He cannot claim the same relief from his Robbery First Degree conviction that Alvin McKamey fortuitously received in *Walton*. McKamey's Robbery First Degree conviction was overturned/reduced as a direct result of the Delaware Supreme Court's overruling of its earlier affirmation of his conviction. Two months later, § 832(a)(2) was amended to clear up any confusion or questionable debate over the requirement of a physical manifestation of a deadly weapon. Additionally, as a point of reference, the Court acknowledges the possibility that, part of the purposeful intent behind the General Assembly's swift and speedy enactment of the amended § 832(a)(2) might have been linked to the foreseeable need to forestall the anticipated plethora of postconviction relief motions, which would potentially be generated in the wake of *Walton*, by defendants who had already been convicted of Robbery First Degree under similar circumstances.

Thus, according to § 832(a)(2), as amended, mere representation by word or conduct that an individual is in possession or control of a deadly weapon is sufficient to find an individual guilty of Robbery First Degree. In consideration of the plain, unambiguous, meaning and legislative intent accorded to the recently amended version of § 832(a)(2), Defendant's conduct at the time of his criminal act falls squarely within these parameters. His action of concealing his hand under his jacket, coupled with his verbal threat to "Back Off," more than satisfies a finding under the currently enacted requirements of § 832(a)(2). Having found that Defendant's criminal conduct warrants a proper conviction of Robbery First Degree under the respective versions of § 832(a)(2), in effect in 1998, and at the time of his filing the instant Rule 61 motion, Defendant's motion is denied.

This fact being established, the Court deems it a prudent measure to address the issue of whether denial of Defendant's Rule 61 motion violates or infringes upon his constitutional rights protecting him from imposition of *ex post facto* laws. Since *Walton* nullified § 832(a)(2), in part, the subsequent enactment of its amended counterpart constitutes a "new law" only in the purest sense of the word. Consequently, a determination of whether application of amended § 832(a)(2), resulting in denial of Defendant's request for relief, would violate the *Ex Post Facto* Clause of the United States Constitution and the Delaware Constitution, is in order. Defendant committed the criminal offense prior to the effective date of the provisional amendment to § 832(a)(2). He was properly convicted under the prior version of § 832(a)(2), which prohibited the same conduct, as then interpreted by the Delaware courts, until the advent of *Walton*.

*9 Article I, Section 10, of the United States Constitution provides that, "[N]o State shall ... pass any ... ex post fact Law ..." [FN56] This exclusion of *ex post facto* laws applies only to retroactive penal statutes that disadvantage a defendant. [FN57] "It is equally well established that, '[e]ven though it may work to the disadvantage of a defendant, a procedural change [in the law] is not *ex post facto*." ' [FN58] Further, the United States Supreme Court has held that only substantive, not procedural, changes in a penal statute would be *ex post facto*. [FN59] In addition, the party challenging a law as *ex post facto* bears the burden of demonstrating that the new law represents a substantive change. [FN60] In order to meet this burden, the challenging party must establish that: 1) the new law is retrospective—in other words, it applies to events

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
2004 WL 1551513 (Del.Super.)
(Cite as: 2004 WL 1551513 (Del.Super.))

occurring before its enactment; and 2) that the new law disadvantages the defendant. [FN61]

FN56. U.S. CONST. art. I, § 10.

FN57. *Collins v. Youngblood,* 497 U.S. 37, 41 (1990).

FN58. *State v. Cohen,* 604 A.2d 846, 853 (Del.1992) (quoting *Dobbert v. Florida,* 432 U.S. 282, 293 (1977)); *see also Hopt v.. Utah,* 110 U.S. 574, 590 (1884) (holding that a change is procedural if it does "[n]ot increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt.").

FN59. *Dobbert v. Florida,* 432 U.S. 282, 293 (1977).

FN60. *Cal. Dept. of Corrections v. Morales,* 514 U.S. 499, 510 (1995).

FN61. *Weaver v. Graham,* 450 U.S. 24, 29 (1981).

Upon review of the revised § 832(a)(2), the Court finds that its amended form cannot be characterized as either creating a substantive change, or working to the disadvantage of the Defendant. The newly amended provision, § 832(a)(2), is merely an extension of the prior provision, purely elaborating, clarifying, and augmenting the meaning attributable to manifesting a "deadly weapon." Broadening the scope of § 832(a)(2)'s terminology to include "representing by word or conduct" is indicative of a purely procedural change, that in no way increases or enlarges the degree or severity of the punishment involved with the offense. Hence, the newly configured law does not apply *retrospectively* to events occurring before its enactment, because the *same inherent form and substantive meaning* of the law was in effect at the time of Defendant's criminal act. This statutory provision was the controlling law under which he was sentenced. Only to the extent that § 832(a)(2) was temporarily modified by the *Walton* decision for a period of two months, was

there an "interruption" in its interpreted meaning and intent. In essence, the amended § 832(a)(2) acted solely as the "white-out," applied to the prior version of § 832(a)(2), as modified by *Walton,* to alleviate any misinterpretation attributable to the *Walton* decision.

In conclusion, based on the findings set forth in *Walton,* and the overall legislative intent behind the clarification of the revised 832(a)(2), it is evident that the latest amendment to § 832(a)(2), does not serve to alter the fundamental objective or inherent import of Delaware's Robbery First Degree statute. The amendment, as applied, does not increase the quantum of punishment, but merely illuminates the warranted circumstances under which it is to be imposed. The newly enacted law simply clarifies the method and means by which finders of fact, and courts, determine Robbery First Degree. Section 832(a)(2) does not alter the substance or degree of punishment to be imposed on a defendant, nor inflict a greater punishment for an existing criminal offense. Nor does it produce a law resulting in evidentiary changes that require less proof in order to convict a defendant. Accordingly, the Court finds that the amendment to Section 832(a)(2) is procedural, not substantive in nature, and does not invoke the repercussions of an *ex post facto* law as envisioned in the United States and Delaware Constitutions.

\*10 As well, Defendant's "colorable claim" that he is entitled to a retroactive right, relied upon for the first time since his appeal, is erroneous. Any right that may have burgeoned from the *Walton* decision, was extinguished by the enactment of § 832(a)(2), as amended. His contention that he has suffered a "miscarriage of justice" because of a constitutional violation that undermined the fundamental fairness of his trial, is not supported either by the law or the factual circumstances surrounding his criminal conviction and sentencing. Defendant's claim falls well below the required tenets embodied within the necessary showing of a "miscarriage of justice" pursuant to Rule 61(i)(5).

### Conclusion

For all of the foregoing reasons, Defendant's Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61 is hereby DENIED.

IT IS SO ORDERED.

2004 WL 1551513 (Del.Super.)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

IN THE SUPREME COURT OF THE STATE OF DELAWARE

KENNETH SMITH,                          §
                                        §
    Defendant Below-                    §  No. 303, 2004
    Appellant,                          §
                                        §  Court Below—Superior Court
    v.                                  §  of the State of Delaware,
                                        §  in and for New Castle County
STATE OF DELAWARE,                      §  Cr.A. No. IN98-01-1102
                                        §  Cr. ID. 9712014022
    Plaintiff Below-                    §
    Appellee                           §

Submitted:    August 18, 2004
Decided:      September 21, 2004

Before **STEELE**, Chief Justice, **HOLLAND**, and **BERGER**, Justices.

### O R D E R

This 21st day of September 2004, after careful consideration of the appellant's opening brief and the State's motion to affirm, we find it manifest that the judgment of the Superior Court should be affirmed on the basis of the Superior Court's well-reasoned decision dated June 28, 2004. The Superior Court did not err in concluding that Smith's second motion for postconviction relief was time-barred and that Smith had failed to overcome this procedural hurdle.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

_____
Justice

Ex. D

Redacted Copy of Exhibit E

Exhibit J:
Affidavit of Probable Cause

ate of Delaware vs KENNETH M SMITH
so known as: KENNY
te of birth: ███████ 1965     Sex: M
as: BRO     Hair: BLK     Height: 508
cused's home add: ███████████

: WILMINGTON, DE 19802

cused's Home Ph : ███████████

cused's employer: CARLTONS CLEANERS
:
:
:
cused's Emp Pho: 0
cused's Work Hr:

Police Complaint Number: 0197110839
SBI Number: 00193906
Accured's age: 32
Race: B     Weight: 145
SOCIAL SECURITY NUMBER ███████
Driver's License DE - ███████████

Name, Home and Work Addresses, and
Telephone Numbers of Next of Kin
or Parent/Guardian
: EMMA BROWN
████████████████
: WILMINGTON, DE
Phone: ███████████
Work :

tation: Vict to accused: STRANGER                              :

rtim's Age : 36
rtim's D.O.B. : ███████ 1961
re(s) and time(s) of offense: 12/22/1997 14:30 thru 12/22/1997
:ation where offense occurred: PARKING LOT VALUE CITY 401 NAAMANS RD  CLAYMONT

Your affiant VINCENT FISCELLA can truly state that:
  YOUR AFFIANT IS A DELAWARE STATE TROOPER ASSIGNED TO THE ROBBERY SQUAD
STATE POLICE TROOP 2 , CRIMINAL INVESTIGATIONS DIVISION.
  ON MONDAY 122297 WRITER WAS ASSIGNED TO INVESTIGATE A ROBBERY WHICH
OCCURRED AT THE VALUE CITY STORE 401 NAAMANS RD CLAYMONT DE. THE VICTIM IN
THIS CASE, JOHN GIORDANO IS A EMPLOYEE OF VALUE CITY. GIORDANO ADVISED THAT
HE OBSERVED THE DEFENDANT WALKING TOWARDS THE FRONT DOORS OF THE BUSINESS
WITH TWO PERRY ELLIS COATS OVER HIS ARM. GIORDANO ADVISED THAT HE THEN
OBSERVED THE DEFENDANT WALK PAST THE CASH REGISTERS AND EXIT OUT THE FRONT
DOORS WITHOUT PAYING FOR THE PROPERTY.
  GIORDANO THEN RESPONDED OUT SIDE INTO THE PARKING LOT AND CONFRONTED THE
DEFENDANT. THE DEFENDANT TURNED AND STATED TO THE VICTIM, "BACK OFF" AND
HELD HIS RIGHT HAND UNDER HIS COAT AS IF HE WAS POINTING A HANDGUN AT THE
VICTIM. THE VICTIM BELIEVING THAT THE SUSPECT DID HAVE A GUN BACKED AWAY
FROM THE DEFENDANT AND RESPONDED BACK INTO THE STORE. GIORDANO THEN CALLED
9-11 CENTER TO REPORT THE CRIME AND ADVISED THAT HE BELIEVED THAT THE
DEFENDANT WAS ARMED WITH A HANDGUN.
  TROOPER PISER 3863 RESPONDED TO THE VALUE CITY STORE AND CONTACTED THE
VICTIM. GIORDANO ADVISED TROOPER PISER THAT THE TWO PERRY ELLIS JACKETS
WERE VALUED AT $75.00 EACH FOR A TOTAL LOSS OF $150.00. THE DEFENDANT WAS
LATER TAKEN INTO CUSTODY IN THE PARKING LOT OF THE VALUE CITY WITHOUT
INCIDENT.  NO WEAPON WAS LOCATED AND THE PROPERTY WAS NOT RECOVERED. THE
VIDEO TAPE WAS PULLED FROM THE VALUE CITY STORE AND YOUR AFFIANT VIEWED THE
TAPE. YOUR AFFIANT THEN IDENTIFIED THE DEFENDANT AS THE PERSON WHO FLED THE
VALUE CITY STORE WITH THE PROPERTY.

_____                    _____
(Affiant)                                  (Judge-Master-Commissioner-Court Official)
                                           Sworn to and subscribed before me
                                           this 22 of December, 1997

Ex.E

Exhibit A

State of Delaware vs KENNETH M SMITH                    2-20 Yrs.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                    Court Case: 9712014022
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Complaint Number: 0197110839    Arrest Number: 218771    Charge Sequence: 001
Charge: ROBBERY FIRST DEGREE                               N 98-01-0594
        -DISPLAYS WHAT APPEARS TO BE A DEADLY WEAPON
In Violation of: 11-DE-0832-00A2-F-B
Location of Violation: PARKING LOT VALUE CITY 401 NAAMANS RD  CLAYMONT DE
  TO WIT: KENNETH M SMITH, on or about the 22nd day of December, 1997, in  the
    County  of  New Castle, State of Delaware, did when in the course  of
    committing  theft, threaten to use force upon JOHN GIORDANO with  the
    intent  to compel JOHN GIORDANO to deliver up property consisting  of
    TWO  PERRY  ELLIS  WINTER JACKETS VALUED AT $150.00 and when  in  the
    course of commission of the crime, he displayed what appeared to be a
    deadly WEAPON, TO WIT: IMPLIED THAT HE HAD A HANDGUN.

Exhibit B

Statement of Probable Cause (Continued)

State of Delaware vs KENNETH M SMITH

5. YOUR AFFIANT FEELS THAT HE HAS CLEARLY LINKED THE DEFENDANT TO THE LISTED
   CRIME. BASED ON THE STATEMENT BY THE VICTIM THAT HE BELIEVED THAT THE
   DEFENDANT HAD A GUN. THE VICTIMS 9-11 CALL IN WHICH HE ADVISED THAT THE
   DEFENDANT WAS ARMED. THE VIDEO TAPE EVIDENCE WHICH PLACES THE DEFENDANT IN
   THE VALUE CITY STORE AND CLEARLY SHOWS THE DEFENDANT EXIT THE BUSINESS WITH
   THE PROPERTY WITHOUT PAYING, COMMITTING THEFT.
===============================================================================

Affiant:
VINCENT FISCELLA TROOP 2 STATE POLICE Phone 0 Work 0

Victims:
JOHN GIORDANO

_____
                 Affiant

Sworn and subscribed before me this 22 day of December A.D., 1987

_____
Judge/Master/Commissioner/Court Official

2



To: Clerk of the Court
United States District Court
844 N. King Street
Lockerbox 19
Wilmington, De 19801

U.S.M.S.
X-RAY